UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RONALD CARL ROSE,

        Petitioner,               Case No. 1:12-cv-1344

v.                                       Honorable Robert J. Jonker

LLOYD RAPELJE,

        Respondent.
_____/

**OPINION**

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is imprisoned for a term of 25 years to 50 years. Petitioner is serving six concurrent sentences: four terms of 25 years to 50 years and two terms of 16 months to 24 months. The sentences were imposed by the Allegan County Circuit Court on June 6, 2008, after a jury convicted Petitioner of four counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b and two counts of disseminating sexually explicit matter to a minor, MICH. COMP. LAWS § 722.675. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.      Allowing a witness testify against an accused from behind a screen violates the Due Process Clause.

    II.     Allowing a witness to testify against an accused from behind a screen violates the Confrontation Clause.

(Pet., ECF No. 1, PageID.5,9.) Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied. Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

**Procedural History**

    **A.**    **Trial Court Proceedings**

During the months (and perhaps even years) preceding June 30, 2007, JB (a girl who was eight years old at the time of Petitioner's trial in April of 2008), and her brother RB, approximately two years her senior, spent a significant amount of time at the home of their adult sister and her husband, Petitioner. That stopped on June 30, 2007, because on that date JB broke down and told her mother that Petitioner had been sexually assaulting JB and RB when they visited or stayed at Petitioner's home.

Following a three-day trial beginning on April 22, 2008, a jury convicted Petitioner of repeatedly raping JB (digital-vaginal penetration, penile-vaginal penetration, penile-oral penetration, and penile-anal penetration) and showing pornographic videos to JB and RB. On June 6, 2008 Petitioner was sentenced as outlined above.

The evidence admitted at trial and the facts underlying the crime are not critically important to resolving Petitioner's habeas claims. Petitioner's claims depend not on the content of JB's testimony at trial but on the trial court's efforts to protect her while she testified. Nonetheless, a brief review of the underlying facts sheds light on the trial court's reasoning for the protection it afforded JB. The Michigan Court of Appeals provided a summary:

> JB testified at trial about the timing and location of the abuse that she suffered. She said that the abuse occurred at Rose's house in the bedroom and living room. Sometimes her older sister was home, and sometimes she was even in the same room, but the sister did not see the abuse because she was asleep when "we did it in the back room." Sometimes the abuse occurred at night and sometimes during the morning.
>
> She also described the nature of the abuse. She said Rose put his private part by her private part—by both the "back and the front." She said he had tried to put

his private into her front private, but it just did not work and she told him it hurt. She said she was sideways on the bed and that white stuff came out of his private part and got on her leg and the bed. JB said that Rose "put his private in the back while I was on my stomach." She said he put it in her "bottom, but it didn't go all the way in." It hurt and she told him. She said she knew that the white stuff came out again because she could feel it on her leg. She said that, a lot of times, he put his private into where her poop comes from.

She also testified that sometimes Rose would touch her front private with his fingers. She said he tried to make his finger go in, but it hurt. In addition, he made her put her "mouth on him" more than once. Sometimes he would touch his private part while she put her mouth on it and would move it in her mouth. He was lying on his back on the bed, and she was on her knees.

Finally, JB testified that Rose would sometimes show her and her brother movies: "They had girls on it and that had the exact same thing that he did to me." He also showed them magazines that had pictures of people with no clothes on. Rose told her that the movies were about having sex, and he would watch the movies with her and RB. He also sometimes had the movies on while he was doing stuff to her. RB also testified at trial. He said he did not like going over to his older sister's house when Rose was there because he would show them bad stuff—videos and magazines with naked people. He would put the videos on, and the people in them would have sex. RB said that Rose told them that the videos showed how babies were made. Sometimes Rose would play with his penis in front of them. Rose would have his pants halfway down and would move his penis up and down. RB said that his older sister was never home when this happened.

Rose's defense was that he had been wrongfully accused. Specifically, he presented testimony—including the testimony of two of JB's older sisters—that suggested that JB's mother caused JB and RB to fabricate the allegations in an effort to break up the marriage between Rose and JB's older sister.

*People v. Rose*, 808 N.W. 2d 301, 307 (Mich. App. 2010).

Prior to testifying at Petitioner's preliminary examination, JB had expressed to the prosecutor her fear of Petitioner and his wife, JB's oldest sister. The prosecutor requested that JB be permitted to testify at the preliminary examination behind a screen. (Prelim. Exam. Transcript, July 31, 2007, ECF No. 13, pp. 3-8.) The trial court permitted the use of the screen over Petitioner's objection based on JB's age, the wishes of her family, the nature of the offenses, concern for JB's

welfare, her expressed fear, and hesitancy to testify if forced to be in Petitioner's presence. (*Id*. at p. 7.)[1]

It is difficult to understand the impact of the screen without seeing it in operation.[2]

  

Put simply, the screen permits the accused to see the witness but does not permit the witness to see the accused.

At trial, the prosecutor again moved to allow JB to testify behind a one-way screen because, once again, JB had indicated to the prosecutor and her therapist that she was afraid and would be unable to testify in Petitioner's presence. (Trial Transcript, April 22, 2008, ECF No. 19, p. 123.) JB's therapist provided supporting expert testimony. The therapist testified that JB was afraid to testify in Petitioner's presence and did not want to see him. (*Id*. at p. 128.) The therapist

---

[1]The trial court also permitted JB to have a support person, the victim rights advocate from the prosecutor's office, seated nearby in the jury box. (*Id*. at pp. 5-8.)

[2]The Michigan Court of Appeals did not have that benefit when it issued its opinion. *Rose*, 808 N.W. 2d at 317 ("There is no evidence in the record that disclose the screen's appearance–we do not know its size, shape, or color or the nature of the materials used."). According to the Respondent, that deficiency was remedied when the matter came before the Michigan Supreme Court: "At the request of the Michigan Supreme Court, the parties produced several color photographs and videos of the courtroom and the witness screen from pertinent viewpoints after the trial." (Brief in Opp. to Pet. for Writ of Cert., ECF No. 30, p.12 n. 4; *see also* Stip. of Supplemental Exhibits, ECF No. 26.) The images set forth herein are taken from the digital images and videos submitted to the Michigan Supreme Court and provided by Respondent to this Court as part of the Rule 5 materials. (ECF Nos. 9-10.) The images are provided to facilitate a general understanding of the appearance and function of the screen device. The Michigan Court of Appeals, the state court that adjudicated the claim on the merits, did not have the images as part of the record before it. Accordingly, the images are not part of the record for purposes of this Court's review. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

testified that a face-to-face confrontation with Petitioner may be a triggering event that could cause JB to experience the trauma again; that it might numb her, shut her down, and render her unable to speak. (*Id*. at p. 129.) The therapist testified that it was likely that JB would be psychologically and emotionally unable to testify without the protection the screen would provide. (*Id*. at p. 131.) The therapist was clear that JB's fear was not simply a fear of testifying, but was instead a fear of testifying in front of the Petitioner. (*Id*. at pp. 136-137.) The therapist testified that absent protection, JB could potentially regress in her therapy. (*Id*. at p. 141.)

> The trial court granted the motion:
>
> So, based on the testimony of her therapist who has 12 or 13 years experience and has been providing therapy for this witness, who is 8 years old, not a teenager, and looking at the nature of these offenses, there's 4 counts of criminal sexual conduct involving penetration, and the disparity of age and also the other counts in respect to criminal sexual conduct in the second degree, and accosting for immoral purposes, distribution of obscene materials, I'm satisfied that based on the testimony of the therapist there's a high likelihood that it could cause her to regress in her therapy, have psychological damage to her in recovering from the allegations, and regressing in her therapy and psychologically to restoring her to a condition that would allow her to function as a normal human being in society, based on her request, the therapist has also indicated that this could cause her to possibly not testify, to become–I'm not sure of all the terms that she said she used in respect to how this could affect her. The child's expression that she's very afraid, didn't want to see the defendant. I think that's much different than an adult or an older teenager, an older child. This was expressed as recently as yesterday so that I'm satisfied that the criteria of the statute under 600.2163A have been met and it's necessary to permit this to protect the welfare of this child.
>
> So, I don't think that that's too intrusive of the right to confrontation because the defendant and his counsel will be present during her testimony, they'll be able to see her, and be able to cross examine her, as will the jury. So, the motion is granted.

(*Id*. at pp. 144-145.) Based on the court's comments prior to ruling on the motion, it was apparent that the court considered the use of the screen to be less offensive to Petitioner's rights than the use of a video deposition. (*Id*. at p. 143.)

- 5 -

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on August 3, 2009, raised three issues. The two issues he has raised in this action were presented as one issue. (*See* Def.-Appellant's Br. on Appeal, ECF No. 25.) By opinion released on July 1, 2010, and published on August 26, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. *Rose*, 808 N.W. 2d at 301.

Petitioner sought leave to appeal to the Michigan Supreme Court. The Michigan Supreme Court initially granted leave to appeal on February 2, 2011. *People v. Rose*, 793 N.W.2d 235 (Mich. 2011). The supreme court directed the parties to address the issues Petitioner raises here: "The parties shall address whether the use of a screen to shield a child complainant from the defendant during testimony violates the Confrontation Clause or prejudices the defendant because it impinges on the presumption of innocence." *Id.* The parties fully briefed the issues and, by invitation or permission of the supreme court, interested individuals and organizations filed several *amicus curiae* briefs. The parties presented oral arguments on October 5, 2011. Then, on December 9, 2011, the court vacated its grant of leave to appeal "because [it was] no longer persuaded that the questions presented should be reviewed by this Court." *People v. Rose*, 805 N.W.2d 827 (Mich. 2011). Justice Marilyn J. Kelly wrote a dissent wherein she concluded that the use of the screen in Petitioner's trial was so inherently prejudicial that it violated his due process rights. *Id.* at 828-829.

Petitioner thereafter sought a writ of certiorari in the United States Supreme Court. The Supreme Court denied the petition on June 18, 2012. *Rose v. Michigan*, 132 S. Ct. 2773 (2012).

Petitioner then filed his petition in this Court.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38

(2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances

indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### A.  Confrontation Clause

#### 1.  Clearly established federal law

The clearly established federal law with respect to Petitioner's Confrontation Clause challenge is set forth in two cases: *Coy v. Iowa*, 487 U.S. 1012 (1988), and *Maryland v. Craig*, 497 U.S. 836 (1990). John Avery Coy was charged with sexually assaulting two 13-year-old girls while they were camping in the backyard of the house next door to his. *Coy*, 487 U.S. at 1014. At the beginning of his trial, the prosecutor asked the court to permit the girls to testify either via closed-

circuit television or behind a screen, as permitted under a recently enacted statute. *Id.* The court permitted the use of a large screen to be placed between the girls and Coy. *Id.* The screen enabled Coy dimly to perceive the witnesses, but the girls could not see him at all. *Id.* at 1015. Coy objected to the use of the screen. He argued that he was entitled to a face-to-face confrontation and that the screen violated his due process right because it eroded the presumption of innocence. *Id.* The Iowa Supreme Court rejected Coy's arguments. That court concluded that there was no Confrontation Clause violation because Coy's ability to cross-examine witnesses was unimpaired. *Id.* It further concluded that the screen was not inherently prejudicial and, therefore, did not impinge on Coy's due process rights. *Id.*

The Supreme Court reviewed the historic and policy roots underlying the Confrontation Clause. The Court recognized that the clause provided "'two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.'" *Id.* at p. 1017 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). The Court carefully considered the competing interests where an abused child is called upon to testify against the abuser:

> The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that we have had more frequent occasion to discuss the right to cross-examine the accuser; both "ensur[e] the integrity of the fact-finding process." *Kentucky v. Stincer, supra*, 482 U.S., at 736. The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.

*Id.* at 1019-1020 (parallel citation omitted). With respect to the use of the screen at Coy's trial, the Court concluded that "[i]t is difficult to image a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id.* at 1020.

Concluding that the screen violated Coy's rights did not end the analysis. The Court acknowledged "that rights conferred by the Confrontation Clause are not absolute, and my give way to other important interests." *Id.* The Court did not explore what "other important interests" might warrant an exception to the face-to-face confrontation right. *Id.* at 1021. It rejected as insufficient, however, the legislative presumption of trauma and suggested that any exception "would surely be allowed only when necessary to further an important public policy[,]" and would have to be based on "individualized findings that these particular witnesses needed special protection . . . ." *Id.* The Court remanded to the Iowa Supreme Court for an assessment of harmlessness[3] and found it unnecessary to address the due process claim. *Id.* at 1021-1022.

Two years later, the Supreme Court was called upon to elaborate on the *Coy* decision in *Maryland v. Craig*, 497 U.S. 836 (1990). Sandra Ann Craig was charged with child abuse, first and second degree sexual offenses, perverted sexual practice, assault, and battery against a six-year-old girl. *Id.* at 840. Before Craig's trial, the prosecutor asked the court to permit the child to testify by way of one-way closed circuit television. *Id.* Maryland statute permitted such a procedure where the trial judge determined that requiring a child victim to testify in the courtroom would result in the child suffering serious emotional distress such that the child could not reasonably communicate. *Id.* at 841. If the trial court so determined, the statute provided for the following:

---

[3]The Iowa Supreme Court concluded that, because the girls' testimony was the only direct evidence, the violation was not harmless and remanded for a new trial. *State v. Coy*, 433 N.W. 32d 714 (Iowa, 1988).

- 11 -

> Once the procedure is invoked, the child witness, prosecutor, and defense counsel withdraw to a separate room; the judge, jury, and defendant remain in the courtroom. The child witness is then examined and cross-examined in the separate room, while a video monitor records and displays the witness' testimony to those in the courtroom. During this time the witness cannot see the defendant. The defendant remains in electronic communication with defense counsel, and objections may be made and ruled on as if the witness were testifying in the courtroom.

*Id.* at 841-42. The prosecutor put an expert on the stand regarding the impact of requiring face-to-face testimony from each child.[4] The Maryland Court of Appeals characterized the expert's testimony as follows:

> "The expert testimony in each case suggested that each child would have some or considerable difficulty in testifying in Craig's presence. For example, as to one child, the expert said that what 'would cause him the most anxiety would be to testify in front of Mrs. Craig . . . .' The child 'wouldn't be able to communicate effectively.' As to another, an expert said she 'would probably stop talking and she would withdraw and curl up.' With respect to two others, the testimony was that one would 'become highly agitated, that he may refuse to talk or if he did talk, that he would choose his subject regardless of the questions' while the other would 'become extremely timid and unwilling to talk.'"

*Id.* at 842 (quoting *Craig v. State*, 560 A. 2d 1120, 1128-29 (Md. 1989)).

The individualized findings that each child witness needed special protection permitted the Court to explore further the potential limits of a criminal defendant's right to a face-to-face meeting with opposing witnesses. The Court listed the important elements of confrontation, physical presence, oath, cross-examination, and observation of demeanor by the trier of fact, and noted that face-to-face confrontation was not necessarily essential to vindicating the purpose of the Confrontation Clause. *Id.* at 846-47 ("[F]ace-to-face confrontation is not the *sine qua non* of the confrontation right."). Therefore, "'competing interests, if 'closely examined,' may warrant dispensing with confrontation at trial.'" *Id.* at 848 (quoting *Ohio v. Roberts*, 448 U.S. 56, 64 (1980)).

---

[4] Although the charges related to one victim, several victims were scheduled to testify. *Craig*, 497 U.S. at 842.

The Supreme Court concluded that "[a]s we suggested in Coy, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

With that conclusion in mind, the Court evaluated whether the Maryland solution sufficiently assured the reliability of the testimony:

> We find it significant, however, that Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony. These safeguards of reliability and adversariness render the use of such a procedure a far cry from the undisputed prohibition of the Confrontation Clause: trial by ex parte affidavit or inquisition . . . . Rather, we think these elements of effective confrontation not only permit a defendant to "confound and undo the false accuser, or reveal the child coached by a malevolent adult," . . . but may well aid a defendant in eliciting favorable testimony from the child witness. Indeed, to the extent the child witness' testimony may be said to be technically given out of court (though we do not so hold), these assurances of reliability and adversariness are far greater than those required for admission of hearsay testimony under the Confrontation Clause. . . . We are therefore confident that use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause.

*Id.* at 851-52 (citations omitted). With reliability assured, the only question remaining was whether the procedure was "necessary to further an important state interest." *Id.* at 852. On that point the Court held "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the

use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 855.

Finally, the Court provided guidance as to the nature of the requisite "showing of necessity." It must be case-specific, based on evidence that the procedure is necessary to protect the welfare of the child, and the trauma must be a product of being in the presence of the defendant (as opposed to the trauma of being in the courtroom generally). *Id.* at 855-56. The Court declined to decide the exact measure of trauma required, but declared that it must be "more than *de minimis*." *Id.* at 856. The Court accepted that the Maryland requirement of "serious emotional distress" was sufficient to justify the procedure. *Id.*[5]

### 2. The Michigan court's application of federal law

The Michigan Court of Appeals reviewed the Supreme Court decisions in *Coy* and *Craig*. The court of appeals stated that Michigan had previously recognized and adopted the *Craig* test in *People v. Burton*, 556 N.W. 2d 201 (1996). Thereafter, the court relied on citations to *Burton*, an opinion which expressly relied on *Craig*. In resolving Petitioner's claims, the court of appeals first considered whether the trial court had determined that the screen procedure was necessary to further an important state interest. *Rose*, 808 N.W. 2d at 314. Then, the court of appeals considered whether the trial court had heard evidence regarding whether the procedure was necessary to protect the witness. *Id.* From that evidence, the court of appeals explained, the court must determine whether the witness would be traumatized by the presence of the defendant and that the emotional

---

[5]It is interesting to note that, on remand, the Maryland Court of Appeals still reversed Craig's conviction and ordered a new trial. *Craig v. State*, 588 A.2d 328 (1991). The court took that action to ensure that its interpretation of the Maryland statute would be given effect to "satisf[y] the Legislature's intendment, even though it may not, in some part, be constitutionally compelled." *Id.* at 336. One of the elements the Maryland court sought to preserve, even though the Supreme Court had deemed it unnecessary, was the questioning of the child in the defendant's presence so the judge could personally observe the child's reaction before allowing the closed circuit televised testimony. *Id.* at 335.

distress would be more than *de minimis*. Measured against the *Craig* standard, the court of appeals concluded that the use of screen did not violate Rose's confrontation right. *Id.* at 314.

That the Michigan court's resolution of Petitioner's confrontation clause challenge was neither contrary to, nor unreasonable application of, clearly established federal law. The court of appeals evaluated the use of the screen in Petitioner's case following precisely the analysis prescribed in *Craig*. Nor can it be said that the facts underlying application of the *Craig* test were unreasonably determined. The expert's testimony provided the factual support necessary for the screen device to be employed. Petitioner has provided no evidence, much less the requisite clear and convincing evidence, to rebut the presumption of correctness accorded to the state court's factual findings. Petitioner's Confrontation Clause claim, therefore, is without merit.

### B. Due Process

#### 1. Clearly established federal law

The Supreme Court has not decided a due process challenge to the use of a screen or closed circuit television to protect a witness fearful of testifying in the presence of the accused. Because the majority in *Coy* reversed Coy's conviction and remanded for further proceedings based on its resolution of the Confrontation Clause challenge, the majority never considered the due process challenge to the use of the screen. *Coy*, 487 U.S. at 1022 ("We find it unnecessary to reach appellant's due process claim."). Justice Blackmun, in dissent, however, considered and rejected the due process challenge. *Id.* at 1034-35.[6] Although Petitioner does not agree with Justice Blackmun's conclusion, the arguments of both parties track Justice Blackmun's concise statement of the standard for considering such a claim:

---

[6]Chief Justice Rehnquist joined in Justice Blackmun's dissent. *Id.* at 1025.

> Questions of inherent prejudice arise when it is contended that "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542–543 (1965). When a courtroom arrangement is challenged as inherently prejudicial, the first question is whether "an unacceptable risk is presented of impermissible factors coming into play," which might erode the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 505 (1976). If a procedure is found to be inherently prejudicial, a guilty verdict will not be upheld if the procedure was not necessary to further an essential state interest. *Holbrook v. Flynn*, 475 U.S. 560, 568–569 (1986).

*Coy*, 487 U.S. at 1034 (parallel citations omitted). The resolution of the due process issue by the Michigan Court of Appeals is properly measured against the clearly established federal law cited by Justice Blackmun.

The Michigan Court of Appeals evaluated Petitioner's due process claim by applying the clearly established federal law cited by Justice Blackmun in *Coy*:

> When determining whether a particular procedure is inherently prejudicial, courts examine whether there is an unacceptable risk that impermissible factors will come into play. *Holbrook*, 475 US at 570; *see also Estes v Texas*, 381 US 532, 542-543; 85 S Ct 1628; 14 L Ed 2d 543 (1965) (stating that questions of inherent prejudice arise when "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process"). One important factor in determining whether a particular practice is inherently prejudicial is whether the practice gives rise primarily to prejudicial inferences or whether it is possible for the jury to make a wider range of inferences from the use of the procedure. *Holbrook*, 475 US at 569 ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.").

*Rose*, 808 N.W. 2d at 315.

The court noted that the authority applying the law to screens was quite limited. The court compared Justice Blackmun's dissent in *Coy* and the decision of the Nebraska Supreme Court in *State v. Parker*, 757 N.W. 2d 7 (2008). *Id.* at 315-16. As set forth above, Justice Blackmun

concluded the screen was not inherently prejudicial; the *Parker* court reached the opposite conclusion. The court of appeals sided with Justice Blackmun:

> We do not agree that the use of a screen is inherently prejudicial; rather, we agree with Justice Blackmun's conclusion that a screen is generally not the type of device that brands a defendant with the mark of guilt, such as wearing prison garb or being shackled and gagged. *Coy*, 487 U.S. at 1034–1035 (Blackmun, J., dissenting). We also do not agree with the assertion in *Parker*, 757 N.W.2d 7, that the use of the screen can never be associated with innocuous events or give rise to a wider range of inferences beyond prejudicial ones. *See Holbrook*, 475 U.S. at 569 (noting that the presence of guards does not necessarily give rise to impermissible inferences). Although a juror might conclude that the witness fears the defendant because the defendant actually harmed the witness, a reasonable juror might also conclude that the witness fears to look upon the defendant because the witness is not testifying truthfully. A reasonable juror could also conclude that the screen is being used to calm the witness's general anxiety about testifying rather than out of fear of the defendant in particular. Likewise, anytime a child victim testifies against a defendant who is accused of harming the child victim, the jury is going to reasonably infer that the child has some fear of the defendant. Finally, there are a variety of different screens and screening techniques that may be employed to shield a victim from having to see the defendant and, for that reason, the potential for prejudice will vary depending on the particular screen or screening technique employed. Accordingly, we cannot conclude that the use of a screen—no matter what its size or composition may be and no matter how it was employed at trial—must in every case be presumed to prejudice the defendant. *See id.* at 569 ("However, 'reason, principle, and common human experience,' counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.") . . . .

*Rose*, 808 N.W. 2d at 316-17 (parallel citations omitted). Absent inherent prejudice, the court of appeals concluded Petitioner's challenge failed because there was nothing in the record to support a claim that the screen caused actual prejudice to Petitioner. *Id.* at 317.[7]

---

[7] The court of appeals took the analysis one step further. It hypothesized that even if the use of the screen were inherently prejudicial, its use was justified to further an essential state interest: the protection of children. Id. at 317 (citing *Craig*, 497 U.S. at 855-57). The court of appeals rejected the assumption in *Parker* that video or closed circuit testimony would always be preferable to or less prejudicial than using a screen. *Id.* at 318.

Petitioner insists that the use of the screen is inherently prejudicial. He supports his position with cites to the *Parker* opinion and the dissent authored by Michigan Supreme Court Justice Marilyn J. Kelly. Those sources, no matter how persuasive, are not clearly established federal law as determined by the Supreme Court of the United States. The determination of inherent prejudice hinges upon an assessment of the possible inferences a jury might draw from the screen. The Supreme Court has explained that "[c]ourts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Estelle v. Williams*, 425 U.S. at 504. The Sixth Circuit has recognized that the *Estelle v. Williams* standard (to do one's best to evaluate likely effects based on reason, principle, and common human experience) is not particularly specific guidance such that "fairminded jurists could vary widely in assessing various details and risks, especially since the closest Supreme Court analogues involve easily distinguishable circumstances." *Wilkens v. Lafler*, 487 F. App's 983, 990 (6th Cir. 2012). "'The more general the rule at issue'–and thus the greater the potential for reasoned disagreement among fair-minded judges–'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Renico v. Lett*, 559 U.S. 766. 776 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The court of appeals analysis of the inferences a juror might draw from the presence of the witness screen falls within the general guidance provided by *Estelle v. Williams*. Whether another state's supreme court, a Michigan Supreme Court justice, or any fair-minded judge might apply reason, principle or common human experience to reach a different result is immaterial. It cannot be said that the state court's determination is contrary to or an unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief.

**Conclusion**

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:     August 18, 2016            /s/ Robert J. Jonker
                                                                     ROBERT J. JONKER
                                                                     CHIEF UNITED STATES DISTRICT JUDGE